UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Marian VanOoteghem | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 cv 1048 |
| v. | ) | |
| | ) | |
| Will County Forest Preserve District | ) | |
| and County of Will, Illinois | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Marian VanOoteghem makes the following complaint alleging violations of the Americans with Disabilities Act, the Family and Medical Leave Act, and supplemental state claims, and in support of those allegations, states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Marian VanOoteghem ("VanOoteghem") is an adult resident of the state of Illinois residing in Will County.

2. Defendant Will County Forest Preserve District (the "Forest Preserve") is a division of a local government unit organized and existing under the laws of the State of Illinois.

3. Defendant County of Will, Illinois, is a local government unit organized and existing under the laws of the State of Illinois.

4. This Court has personal and subject matter jurisdiction over the Defendants under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2615, et seq.

1

5. Venue is proper pursuant to 28 U.S.C. § 1391 because the claims asserted in this action arose in this district and the alleged discrimination and damages occurred in this district.

**ALLEGATIONS COMMON TO ALL COUNTS AND**
**INCORPORATED BY REFERENCE**

6. VanOoteghem began her employment with the Forest Preserve in July of 2008 as a Forest Protection Officer. Upon information and belief the Forest Preserve and the County of Will were joint employers of VanOoteghem.

7. VanOoteghem's primary responsibility was patrolling dog parks in the county. Because much of job involved time spent driving between dog parks, she was allowed to work overtime and was provided a Forest Preserve vehicle.

8. VanOoteghem was provided a job description after she was hired. VanOoteghem advised Deputy Chief Mead that it did not correctly reflect the actual responsibilities of the job, but Chief Mead told her, "don't worry about it."

9. The only actual physical requirement of her position was to sitting or standing to check permits.

10. VanOoteghem's regular hours were 7 a.m. – 3 p.m. but she frequently worked additional hours, particularly during the summer.

11. Over the course of her employment, VanOoteghem's job responsibilities grew to include supervising several part-time employees and taking on significant administrative tasks (scheduling, reviewing and compiling reports, etc.)

12. She was promoted to Program Manager and her salary was increased to $32,000/year.

13. At some point in 2012, in conjunction with some staff changes, VanOoteghem suggested several changes to her job description. Management would not allow her to remove

reference to a number of physical requirements even though they were things she was not doing.

14. At some point in 2013 both VanOoteghem and her colleague Michael Kiegley began experiencing back pain from driving the Forest Preserve vehicle that VanOoteghem had been assigned. VanOoteghem complained to several members of Forest Preserve management and asked that the seat be changed, but her request was ignored.

15. When VanOoteghem's doctor found a herniated disk between L5 and S1 at the end of 2013, VanOoteghem did not file a WC claim even though she believed the injury was likely work-related. Instead, she underwent treatment on her own time and her own dime during the winter of 2014.

16. VanOoteghem did not miss any work, did not request FMLA and never suggested to anyone at the Forest Preserve that the L5/S1 issue was work-related.

17. VanOoteghem threw out her back in November of 2014 while talking to a colleague. She took a week away from work to undergo physical therapy. She continued treatment for over nine months, but once again did not request FMLA or suggest that the injury was work-related. If she had to miss work for an appointment she used vacation, personal, or sick time.

18. At some point in 2015, the fleet vehicle manager emailed and asked VanOoteghem to tell him what was wrong with the vehicle. About a month later, someone advised VanOoteghem that she would be getting a new SUV at some point in 2016 to replace the problematic vehicle.

19. VanOoteghem underwent back surgery in September of 2015.

20. VanOoteghem had approximately eight weeks of paid time off (PTO) and used her accrued time to cover her absence. No one said anything to her about FMLA during this absence.

21. VanOoteghem returned to light duty work after approximately four weeks.

22. VanOoteghem reinjured her back at some point in mid-November, and used accrued PTO to cover the approximately two weeks she was away. No one said anything to her about FMLA during this time.

23. The Forest Preserve vehicle remained in her possession during the entire period, even when she was on light duty and did not need the vehicle to travel between dog parks.

24. In early December of 2016 Donna Suca, Human Resources Coordinator, contacted VanOoteghem to advise her that she was running out of PTO. Suca sent VanOoteghem short-term disability paperwork to complete.

25. VanOoteghem only received a few days of STD pay before Lt. Chapman asked her to cover for an office employee who was out sick.

26. VanOoteghem worked light duty until the end of 2015, even after the employee she had been covering for returned.

27. VanOoteghem had been doing different work than the employee she was covering was assigned, but VanOoteghem was advised around the new year that there was no more work for her (which was not true) because the other employee had returned.

28. VanOoteghem's doctor suggested another surgery, which was scheduled for January 27, 2016.

29. Human resources personnel provided VanOoteghem with a lot of paperwork prior to her time away, but no one explained it to her and she does not know whether any of it related to an FMLA request.

30. On January 22, 2016 VanOoteghem received a letter extending FMLA until April 15, 2016. VanOoteghem was confused because no one had ever told her she was on FMLA, given her an indication of when her FMLA time began, or explained how Defendants were calculating her entitlement.

31. At some point in February or March of 2016 someone from the Forest Preserve picked up VanOoteghem's Forest Preserve vehicle.

32. VanOoteghem returned to full duty without restrictions on April 12, 2016.

33. The next day, April 13, 2016 VanOoteghem was in a car accident during work hours in a Forest Preserve vehicle that she had been assigned.

34. While waiting for the Joliet police to show up and make a report, VanOoteghem called Lt. Chapman and told her about the accident, reporting that she was fine but that there had been damage done to both vehicles.

35. Within 30 minutes of the accident VanOoteghem began experiencing back spasm and radiating nerve pain.

36. VanOoteghem advised the sergeant who came to the scene, Sgt. McCrary about her symptoms while at the scene.

37. VanOoteghem did not complete an accident report at the scene because Sgt. McCrary sent her home.

38. VanOoteghem completed the required insurance and accident reports the next morning, April 14, reporting the injury as work-related.

39. A few days later, VanOoteghem learned that Lt. Chapman had changed her answer on the form regarding the injury to "not work related" because Chapman called VanOoteghem, sounding annoyed, and said, "you told me you were fine." VanOoteghem explained that the symptoms began after their conversation. Lt. Chapman brusquely suggested she would change the form to reflect that the injury was work-related.

40. On April 18, 2016, within minutes of VanOoteghem's surgeon forwarding paperwork taking her off of work, VanOoteghem received a flurry of texts from Lt. Chapman, expressing no concern for her well-being but instead demanding protocols and forms that had already been completed. It seemed clear Lt. Chapman was upset the injury was being processed as work-related, as she had never behaved like this toward VanOoteghem in the past.

41. Less than 24 hours later someone picked up VanOoteghem's Forest Preserve vehicle.

42. Despite the fact that VanOoteghem had filed an injury report she had to obtain an attorney to force Defendants to process the claim. Before counsel was involved, Forest Preserve representatives told VanOoteghem to use PTO and suggested that once her PTO was used she would not be paid.

43. As soon as VanOoteghem retained counsel and began seeking to utilize the benefits to which she was entitled under the Illinois Workers' Compensation Act, Defendants made the decision to attempt to create a false record they could use to support VanOoteghem's termination.

44. Instead of paying temporary total disability (TTD) Defendants found light duty work for VanOoteghem, but the work environment was hostile and harassing. Several co-workers made disparaging remarks to her face, while others simply ignored her presence. Before the car accident VanOoteghem had considered Lt. Chapman a friend, but after VanOoteghem reported a work injury Lt. Chapman was short-tempered and curt with VanOoteghem. There was no sense in complaining since management seemed complicit.

45. VanOoteghem's doctor suggested that surgery would be the only way for VanOoteghem to see improvement in her symptoms.

46. Defendants wasted no time in scheduling VanOoteghem for an independent medical examination, which took place at the end of June, 2016.

47. Almost immediately after the IME report was received in early August, Suca insisted on meeting with VanOoteghem to discuss my status.

48. Not surprisingly, the IME suggested that the car accident was not work-related.

49. Suca never advised VanOoteghem about her rights under WC to contest the IME. Rather, Suca spoke to VanOoteghem as though the IME entitled Suca to treat VanOoteghem as though her WC benefits had been terminated.

50. On or about August 12, 2016 VanOoteghem met with Suca and Lt. Chapman.

51. VanOoteghem was advised that Defendants do not offer light duty to employees that are not on worker's compensation – a blatant lie in light of the fact that VanOoteghem had been a beneficiary of months of light duty after her first two (non-work-related) injuries.

52. Suca and Lt. Chapman spent the bulk of the meeting questioning VanOoteghem about her physical restrictions and suggesting that she was no longer capable of performing her

Program Manager position. VanOoteghem perceived the meeting as the polar opposite of the interactive process, i.e. an aggressive and unilateral discussion intended to convince VanOoteghem she was incapable of returning.

53. On or about August 15, 2018 VanOoteghem's doctor provided lifting and repetitive activity restrictions – restrictions that had been accommodated without any difficulty prior to Defendants' receipt of the IME, and restrictions that did not impact her ability to perform the essential functions of her job.

54. Indeed, in the eight years VanOoteghem worked as a Forest Protection Office and/or Program Manager, she did not need to repetitively lift, bend, twist or carry weight. VanOoteghem never had to do any of the things Defendants claimed were "essential functions"

55. On August 16, 2016, Van Ooteghem met briefly with Suca and Lt. Chapman again.

56. Suca and Lt. Chapman yet again engaged in the opposite of the interactive process, attempting to force VanOoteghem to concede that she could not do some of the physical activities listed on the job description when VanOoteghem kept trying to explain that the activities in question were not part of the job.

57. VanOoteghem left the meeting believing that the only purpose to these adversarial exchanges was to box her into a corner and refuse to return her to her regular job.

58. On August 17, 2017 Defendants sent VanOoteghem a letter describing the August 16, 2016 meeting, mischaracterizing most of the discussion; making it clear to VanOoteghem she would never be provided any reasonable accommodation; and that Defendants intended to terminate her employment rather than engage in the interactive process.

59. VanOoteghem responded on August 19, 2016 by asking about other positions and suggesting that she believed she could perform the essential functions of Program Manager position.

60. Defendants never responded to VanOoteghem's August 19, 2016 letter.

61. Upon information and belief, ,there had recently been, were at the time, or were likely to be, open positions for which VanOoteghm was qualified and could perform with or without accommodation. Defendants never engaged in the interactive process regarding that possibility.

62. Instead, John Gerl sent VanOoteghem a letter dated August 22, 2016 suggesting, without discussion, that she was being placed on a "short-non-FMLA medical leave" pending receipt of a second opinion – an opinion Defendants and any HR professional with even a few years of experience would know could take months to schedule.

63. VanOoteghem was able to schedule an appointment with Dr. Siemionow but was unable to compile complete medical records. VanOoteghem begged the doctor to provide a report quickly given that she was at risk of losing her job. September 9 came and went. VanOoteghem did not contact anyone or ask for an extension since she deemed the entire exercise futile. Defendants had made it clear they were going to terminate her regardless of what she did.

64. Regardless, Dr. Siemionow opined that the accident "exacerbated her pre-existing condition," but his report was not received by the arbitrary deadline Defendants had set.

65. On September 14, 2016 Gerl sent a second letter terminating VanOoteghem's employment

66. Defendants were determined to get rid of VanOoteghem because she was too expensive: her medical costs, whether they were covered by her insurance or through worker's compensation, made her too much of a liability.

67. VanOoteghem would have done just about anything Defendants had requested if it would have allowed her to keep insurance and have the surgery she desperately needed.

68. As further evidence of its animus toward VanOoteghem as a qualified individual with a disability and an individual who had exercised her rights under the workers' compensation laws, and despite the fact that Defendants had terminated VanOoteghem, Defendants contested VanOoteghem's unemployment.

69. VanOoteghem filed a charge with the EEOC on December 29, 2016. Although Defendants agreed to mediate the case, their counsel contacted VanOoteghem's attorney the day before the mediation was scheduled to suggest she had no real authority and that the mediation would not be productive.

70. VanOoteghem received a right to sue letter through counsel sometime after November 16, 2017. A copy of same is attached hereto as Exhibit 1.

71. As further proof of their cost-based motivations, Defendants' worker's compensation attorney suggested that VanOoteghem go on Medicaid to obtain surgery. Desperate for relief from daily pain, VanOoteghem begrudgingly agreed to do so, but has been unsuccessful to date in obtaining the surgery she requires.

72. VanOoteghem lives in constant pain and will be unable to return to full-time unrestricted work until she has the procedure her original doctor recommended in the summer of 2016.

**COUNT I: Americans with Disabilities Act**
**Discrimination/Failure to Accommodate under 42 U.S.C. § 12101, et seq.**

73. VanOoteghem incorporates the statements contained in the preceding paragraphs as though set forth fully herein.

74. VanOoteghem is a qualified individual with a disability.

75. VanOoteghem could have been reasonably accommodated by being transferred to any open position. Not only did Defendants refuse to consider this option, they made certain VanOoteghem was precluded from doing so.

76. VanOoteghem should have been reasonably accommodated by allowing her to return to her prior position.

77. VanOoteghem could have been allowed to remain on short-term disability so that she could obtain surgery with her existing provider.

78. Defendants' treatment of VanOoteghem as a second-class citizen after she attempted to exercise her rights under the ADA was discriminatory.

79. Defendants' claim that they did not accommodate non-worker's compensation employee's requests for light duty was discriminatory

80. Defendants' decision to take away VanOoteghem's light duty assignment was discriminatory.

81. If indeed Defendants are only accommodating worker's compensation employee's requests for light duty, such a policy is discriminatory.

82. Defendants' refusal to provide VanOoteghem the option of transfer to an open position was discriminatory.

83. Defendants' improper reliance on an outdated and incorrect job description was discriminatory.

84. Defendants' refusal to engage in an interactive process regarding return to her prior position was discriminatory.

85. Defendants' decision to terminate VanOoteghem was discriminatory.

86. Defendants' decision to contest unemployment when they had terminated VanOoteghem's employment was discriminatory.

87. Defendants' decision to agree to mediation but then suggest they had no authority was discriminatory.

88. Defendants have violated the Americans with Disabilities Act by taking away VanOoteghem's light duty assignment.

89. Defendants have violated the Americans with Disabilities Act by failing to reasonably accommodate VanOoteghem as described above, either by returning her to her prior position or by transferring her to an open position.

90. Defendants have violated the Americans with Disabilities Act by maintaining a policy that only accommodates individuals with worker's compensation-related disabilities, and not those whose disabilities are not the result of a work-related (or in VanOoteghem's case, a contested) injury.

91. Defendants have violated the Americans with Disabilities Act by terminating VanOoteghem's employment.

92. As a result of Defendants' wrongful actions, VanOoteghem has suffered lost wages; loss of other employment benefits, most importantly access to health insurance; emotional distress; loss of employment and promotional opportunities; and other damages.

WHEREFORE, Plaintiff VanOoteghem respectfully requests that this Court award all monetary and non-monetary amounts available under law including, but not limited to:

a. compensatory damages;

b. lost wages and benefits including back pay;

c. reinstatement to her same or an equivalent position or front pay;

d. pre-judgment interest on all amounts awarded;

e. litigation costs and reasonable attorney's fees;

f. all other such relief as the court may deem just and proper.

### COUNT II: Family and Medical Leave Act
### Interference and Retaliation Relating to 2016 FMLA Utilization
### 29 U.S.C. §2615(a)(1) and (a)(2)

93. VanOoteghem incorporates the statements contained in the preceding paragraphs as though set forth fully herein.

94. VanOoteghem was an eligible employee under the FMLA.

95. Defendants are employers as defined under the FMLA.

96. VanOoteghem was entitled to 12 weeks of leave per calendar year pursuant to the FMLA.

97. VanOoteghem provided notice to her employment of her need for time away to address her own serious health condition when she advised her employer that she would be undergoing surgery, first in September of 2015 and again in January of 2016.

98. VanOoteghem is authorized under the FMLA to request time away from work to address her own serious health condition.

99. VanOoteghem was denied a benefit to which she is entitled under the FMLA: that of returning to her same or equivalent position in terms of pay, benefits and working conditions, including privileges, perquisites and status.

100. Defendants interfered with VanOoteghem's rights under the FMLA by failing to return her to the same or an equivalent position. Instead, as soon as her IME created a question regarding causation, Defendants forced VanOoteghem to take a short unpaid medical leave, and shortly thereafter terminated her.

101. VanOoteghem engaged in statutorily protected conduct by taking leave under the Family and Medical Leave Act.

102. VanOoteghem suffered an adverse employment action, i.e. termination, in retaliation for using her statutorily protected FMLA rights.

103. As a result of Defendants' wrongful actions, VanOoteghem has suffered lost wages; loss of other employment benefits, most importantly access to health insurance; emotional distress; loss of employment and promotional opportunities; and other damages.

WHEREFORE, Plaintiff VanOoteghem respectfully requests that this court award all monetary and non-monetary amounts available under law including, but not limited to:

(a) lost wages and benefits including back pay;

(b) reinstatement to the same or an equivalent position or front pay;

(c) actual damages;

(d) pre-judgment interest on all amounts awarded;

(e) liquidated damages;

(f) litigation costs and attorney's fees;

(g) all other such relief as the court may deem just and proper.

**COUNT III – Retaliatory Discharge in Violation of the Public Policy of Illinois**

104.    VanOoteghem incorporates the statements contained in the preceding paragraphs as though set forth fully herein.

105.    The State of Illinois has a strong public policy to protect the rights of employees to exercise the rights afforded to them by the Workers' Compensation Act.

106.    Defendants, through the actions described herein, prevented VanOoteghem from exercising those rights, and then retaliated against her for doing so.

107.    Specifically, Defendants initially tried to deny VanOoteghem temporary total disability and other rights afforded under the statute. VanOoteghem was successful in obtaining those rights only after she retained counsel.

108.    Specifically, VanOoteghem was harassed by her co-workers and management after filing her claim.

109.    Specifically, Defendants did everything they could to get rid of VanOoteghem so that they would not be responsible for her medical costs.

110.    Specifically, Defendants wrongfully discharged VanOoteghem because Defendants were tired of paying VanOoteghem's medical expenses. Back surgeries are expensive. VanOoteghem was a liability and one that Defendants did not want to continue to carry.

111.     As a result of Defendant's wrongful actions, VanOoteghem has suffered lost

wages, loss of other employment benefits, loss of employment and its related security,

emotional distress, loss of employment opportunities, and other damages.

WHEREFORE, Plaintiff VanOoteghem respectfully requests that this court award all

monetary and non-monetary amounts available under law including, but not limited to:

a.   reinstatement or front pay;

b.   compensatory damages;

c.   lost wages including back pay;

d.   an amount to compensate her for lost future earnings;

e.   pre-judgment interest on all amounts awarded;

f.   litigation costs and reasonable attorney's fees;

g.   all other such relief as the court may deem just and proper.

**JURY DEMANDED FOR ALL CLAIMS**

Respectfully submitted:


_____/s/_____Lisa L. Clay_____
Lisa L. Clay, Attorney at Law
345 North Canal Street, Suite C202
Chicago, IL 60606
Phone: 312.753.5302
lclayaal@gmail.com
ARDC # 6277257