## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARIAN VANOOTEGHEM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 1048 |
| | ) | |
| WILL COUNTY FOREST PRESERVE | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Will County Forest Preserve District's ("the District") motion for summary judgment under Federal Rule of Civil Procedure 56(c). For the following reasons, the Court denies the motion.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

The District is a local governmental unit organized under the laws of the State of Illinois. Tracy Chapman ("Chief Chapman") heads the District's law enforcement department. Donna Suca ("Suca") has been the District's Human Resources Supervisor

since 1993, handling employee accommodation requests, employee workers' compensation claims, employee Family Medical Leave Act ("FMLA") requests, and payroll. Suca reports to the District's Chief Financial Officer, John Gerl ("Gerl"). Gerl oversees financial accounting, human resources, information technology, and the volunteer program; and has worked for the District since 2009.

The District operates five dog parks: (1) Forked Creek Preserve/Ballou Road; (2) Hammel; (3) Lower Rock Run Preserve; (4) Messenger Marsh; and (5) Whalon Park Preserve. Plaintiff Marian VanOoteghem ("VanOoteghem") was hired by the District as a Forest Protection Officer ("FPO") on July 21, 2008. In August of 2010, VanOoteghem was promoted to the position of Forest Protection Officer Program Manager ("FPOPM") and in 2016 her job title was changed to Community Service Officer Program Manager ("CSOPM").

**Duties of a CSOPM**

The parties agree that a CSOPM must assist with district events by working traffic control or parking. The "Essential Duties and Responsibilities" section of a CSOPM's job description includes:

> To perform a variety of duties involved in the enforcement of laws and prevention of crimes; to provide a high level of customer service and integrate the community into policing activities; to participate in community based police activities and programs; and to perform a variety of technical and administrative tasks in support of law enforcement services and activities. The work of this position involves responsibility for the protection of life and property, and prevention of crime, the general enforcement of local ordinances in a designated area on an assigned shift

2

or on special assignments. Duties normally consist of routine patrol of FPDWC dog parks, and preliminary investigations. The work involves an element of personal danger and the employee must be able to act without direct supervision and to exercise independent judgment in meeting emergencies.

1:18-cv-01048, Dkt. #50-1 at 10.

The parties dispute what this description means in practice. The District alleges that the position is akin to a "beat cop" who is expected to be visible, let the patrons know that they are there and that patrons and their dogs are safe. According to the District, a CSOPM must be in excellent physical condition to patrol the dog parks and respond to emergencies. Such emergencies would require a CSOPM to run across a park to address an incident, break up a dogfight or a fight between dog owners, remove a dog from the park, or perform any necessary first aid. The District alleges that these tasks are all essential job functions of a CSOPM.

VanOoteghem disputes the assertion that her position is akin to a "beat cop," alleging that her job was to patrol the dog parks daily, check for permits, issue warnings and citations to visitors without a permit, and investigate complaints. She denies that the tasks described by the District are essential, noting that neither she nor her successor ever needed to break up a dogfight. She further alleges that when emergencies occurred her only responsibility was to write up a report of the incident and call the police.

The parties further dispute the nature and extent of VanOoteghem's training. VanOoteghem alleges that she never received the training necessary to perform the

tasks that the District alleges are essential, such as subduing or restraining an individual, using handcuffs, carrying injured persons, or breaking up dogfights. The District alleges that she was trained in police methods including: (1) how to use a tactical baton, (2) how to handle aggressive and dangerous dogs, (3) and CPR training. VanOoteghem was also issued handcuffs, pepper spray, and a tactical baton. VanOoteghem claims she never had to use those items, and she never had to perform the tasks described by the District as essential.

**VanOoteghem's Injury and Accommodations**

On November 25, 2014, VanOoteghem suffered a back injury, which caused her to miss a week of work. In September 2015, she underwent back surgery and was on approved FMLA leave for eight weeks. She returned to work in November 2015 with restrictions that included no bending, lifting, twisting, pushing, or pulling more than eight pounds and was placed in a light duty position from November 2, 2015 until November 9, 2015. VanOoteghem alleges that she did not request to be placed on light duty and that Chief Chapman unilaterally assigned her office work instead of returning her to her position as a CSOPM.

While observing VanOoteghem work in her light duty assignment, Chief Chapman noted that VanOoteghem was not walking well and could not make it through a four-hour workday. On November 8, Chief Chapman emailed Suca noting her concerns and stating that she had canceled VanOoteghem's light duty assignment.

VanOoteghem received approved FMLA leave and did not work from November 9, 2015 through December 20, 2015. Between December 21 and December 31, 2015, VanOoteghem worked a second light duty assignment, filling in for an administrative assistant. This assignment ended in January of 2016, when the assistant returned to work.

The District alleges that VanOoteghem did not have a doctor's note clearing her to work, while VanOoteghem claims she did. For support, VanOoteghem relies on a doctor's note dated November 3, 2015, stating that she may return to part-time work with restrictions. 1:18-cv-01048, Dkt. # 41-15, at 3. In mid-January 2016, VanOoteghem notified the District that she required another back surgery. VanOoteghem requested and the District agreed to extend her leave from January 2016 until April 2016. But the parties dispute what portions of the leave were non-FMLA.

On April 12, 2016, VanOoteghem returned to work with no restrictions and did not request a disability accommodation, to have her job duties altered, or to work light duty. The following day, VanOoteghem was involved in a car accident while she was on duty and driving a District vehicle. On April 18, 2016, VanOoteghem notified the District she would be off work because she reinjured her back in the car accident. As a result, Chief Chapman completed a Form 04 Employee Injury Report.

VanOoteghem did not return to work until the end of May 2016, when she returned to perform light duty work. On June 24, 2016, VanOoteghem underwent an

5

independent medical evaluation ("IME") that concluded her symptoms were related to a preexisting back injury and were not caused by the April 13th accident. While VanOoteghem received temporary light duty assignments between June 1 and August 1, 2016, she had not been cleared by the doctor to patrol the dog parks.

On August 1, 2016, Suca sent the IME results to Gerl and Chief Chapman, noting that VanOoteghem did not seem to walk right and probably needed back surgery soon. Chief Chapman responded that there had been several complaints about inadequate coverage at the dog parks, but the record does not show that any written complaints were filed.

On August 12, 2016, VanOoteghem met with Chief Chapman and Suca to discuss her upcoming doctor's appointment and whether she could perform her essential job functions. However, VanOoteghem testifies that neither Chief Chapman nor Suca ever determined her essential job functions or sought to discuss them at the meeting. After that meeting, Chief Chapman emailed VanOoteghem questions that needed to be answered by her doctor at the appointment on August 15, 2016. These questions concerned the details of VanOoteghem's restrictions, the time for which they would be in place, and asked VanOoteghem to specify other vacant positions in the District that she could occupy instead of the CSOPM position. 1:18-cv-01048, Dkt. # 41-16, at 4.

VanOoteghem's physician provided her with the following list of restrictions: (a) no lifting objects over twenty pounds; (b) no repetitive bending, lifting or twisting;

6

and (c) a fifteen-minute break after two hours of consecutive driving. The restrictions were permanent or would be in place for up to one year after surgery.

On August 16, 2016, VanOoteghem met with Chief Chapman and Suca to discuss her restrictions. At this meeting, Chief Chapman informed her that she could return to work monitoring the dog parks. Chief Chapman testified that VanOoteghem said she could not return to work because she was worried about dogs jumping on her and getting into a car accident. 1:18-cv-01048, Dkt. # 41-6 at 229:12. VanOoteghem testified that she said she would perform those duties despite her pain and requested these accommodations: (1) that she be allowed to take off her belt when entering and exiting her car; (2) that she be exempt from riding a bicycle and an ATV; (3) that she be exempt from walking the entire park when people have to come in and out at one spot. 1:18-cv-01048, Dkt. # 41-2 at 61:18-62:4; 71:5-16; 113:17-114:12; 148:17-18. Chief Chapman told VanOoteghem she could keep her belt off to make it easier to enter and exit the car, but that the District needed additional information from VanOoteghem's doctor on the restrictions she had mentioned in the meeting.

On August 17, 2016, Chief Chapman sent VanOoteghem a letter stating that the restrictions imposed in her doctor's letter would not prohibit her from performing her essential job functions with or without an accommodation. But Chief Chapman asked that VanOoteghem obtain a complete list of her restrictions from the doctor given the discrepancy between those listed in the note and those specified by VanOoteghem at

7

the August 16th meeting. VanOoteghem responded that she believed she could do her normal routine but that hands-on incidents, such as dogfights, would increase her pain. VanOoteghem let Chief Chapman know that she was receiving a second opinion on September 7, 2016.

On August 19, 2016, Suca received an updated list of restrictions from VanOoteghem's doctor that included: (1) no lifting objects over twenty pounds; (2) no repetitive bending, lifting or twisting; (3) no walking uphill; (4) no restraining or subduing an individual; (5) no providing CPR; (6) no breaking up a dogfight; (7) no carrying an injured person; (8) no walking more than half-a-mile at a time; and (9) a fifteen-minute break after two hours of consecutive driving. The note further stated that the restrictions would be in place for a full year after surgery.

Based on these restrictions, Suca determined that VanOoteghem could not perform the essential functions of a CSOPM, which include running, walking the perimeter of a dog park, breaking up a dogfight, engaging in hands-on training, or performing CPR. VanOoteghem disputes that these tasks were essential to her job and that the restrictions prohibited her from performing the essential functions of her job.

In August, Suca met with VanOoteghem to discuss open positions at the District that she could be placed in, including a real-estate position. But VanOoteghem did not apply for any of them. When Suca asked why VanOoteghem did not apply for the real-

estate position, she responded that she knew nothing about real estate. VanOoteghem alleges that she was not informed of all open positions.

On August 22, 2016, Gerl sent a letter to VanOoteghem explaining that her restrictions prohibited her from performing the essential functions of her position, with or without an accommodation. He further noted that VanOoteghem was not qualified for the open positions at the District but could apply for any vacant positions in the future. In his testimony, Gerl conceded that he reviewed no vacant positions before notifying VanOoteghem that she was not qualified for them. 1:18-cv-01048, Dkt. #41-10, at 89.

Given that VanOoteghem was seeking a second opinion on September 7, 2016, Gerl noted that the District was giving her a leave of absence until September 9, 2016, when she could provide a written update as to any restrictions she may have. VanOoteghem did not inquire into vacant positions, and her visit to get a second opinion on September 7, 2016 produced no new recommendations or changes to her restrictions. VanOoteghem did not provide and the District received no new information about the restrictions.

On September 14, 2016, the District issued VanOoteghem a termination letter on the grounds of her continued inability to perform the essential functions of her position with or without a reasonable accommodation. On December 29, 2016, VanOoteghem

filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

Based on these events, VanOoteghem filed her second amended complaint against the District on December 4, 2018, alleging claims for discrimination and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*("ADA"). The District now moves for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence

10

upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (citation and internal alteration omitted).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. Each party opposing a motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise

11

response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## DISCUSSION

The District argues that judgment is proper as to VanOoteghem's failure-to-accommodate claim because VanOoteghem is not a "qualified individual" under the

ADA and the District did not fail to reasonably accommodate her disability.[1]  The District next argues that judgment is warranted on VanOoteghem's ADA discrimination claim because: (1) her termination was lawful, (2) her unemployment claim is not a protected activity, and (3) the District's challenge to the unemployment claim is not an adverse employment action.  The Court addresses each argument in turn.

## I.      Failure to Accommodate Under The ADA

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability[.]"  42 U.S.C. § 12112(a).  Included in the definition of discriminate is "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  To establish a failure-to-accommodate claim, VanOoteghem must show: (1) she "is a qualified individual with a disability;" (2) "the employer was aware of the disability;" and (3) "the employer failed to reasonably accommodate the disability."  *Equal Employment Opportunity Comm'n. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).  The District argues that VanOoteghem cannot establish the first and third elements of her failure-to-accommodate claim.

### A.  Qualified Individual

---

[1] The District also argues that judgment is warranted on all claims arising before March 4, 2016 because those events occurred more than 300 days before VanOoteghem filed a discrimination charge with the EEOC.  VanOoteghem responds that she is not asserting claims based on actions occurring before March 4th, but that she is relying on those facts to support claims based on discrete acts that happened after March 4th.  The District's reply agrees that VanOoteghem's concession moots this issue.  The Court accordingly declines to reach this issue.

13

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To determine whether someone is a "qualified individual," courts apply a two-step test: (1) whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc., and, if so, (2) whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001) (quotation omitted). There is no dispute that VanOoteghem satisfied the prerequisites for the CSOPM position. At issue is her ability to perform the essential functions of the job, with or without accommodations.

The District argues that VanOoteghem's restrictions prevent her from performing the essential functions of her job, with or without accommodations. VanOoteghem denies this, arguing that the restrictions in place do not affect the essential functions of her position. Central to this issue is a fundamental disagreement among the parties as to what are the essential functions of a CSOPM.

To determine the essential functions of the job, courts consider "the employee's job description, the employer's opinion, the time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current

work experiences." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015).

### 1. Job Description

The "Essential Duties and Responsibilities" section of VanOoteghem's job description states:

> To perform a variety of duties involved in the enforcement of laws and prevention of crimes; to provide a high level of customer service and integrate the community into policing activities; to participate in community based police activities and programs; and to perform a variety of technical and administrative tasks in support of law enforcement services and activities. The work of this position involves responsibility for the protection of life and property, and prevention of crime, the general enforcement of local ordinances in a designated area on an assigned shift or on special assignments. Duties normally consist of routine patrol of FPDWC dog parks, and preliminary investigations. The work involves an element of personal danger and the employee must be able to act without direct supervision and to exercise independent judgment in meeting emergencies.

1:18-cv-01048, Dkt. #50-1 at 10.

This description does not provide sufficient factual details for the Court to determine VanOoteghem's essential job functions, and whether the restrictions prohibited her from performing those functions. Accordingly, we turn to the next factor.

### 2. Employer's Opinion

15

While "the employer's judgment is an important factor … it is not controlling." *Stern*, 788 F.3d at 285–86. Courts "also look to evidence of the employer's actual practices in the workplace." *Id.*

The District alleges that the position is akin to a "beat cop" who is expected to be visible and assure the patrons that they and their dogs are safe. The District claims that a CSOPM must be in excellent physical condition to patrol the dog parks and respond to emergencies. Such emergencies would require a CSOPM to run across a park to address an incident, break up a dogfight or a fight between their owners, remove a dog from the park, or perform any necessary first aid. According to the District, these tasks are all essential to job function of a CSOPM.

VanOoteghem denies that her position is akin to a "beat cop," alleging that her job was to patrol the dog parks daily, check for permits, issue warnings and citations to visitors without a permit, and investigate complaints. She disputes that the tasks described by the District are essential, noting that neither she nor her successor were ever needed to break up a dogfight. She further claims that if emergencies occurred, she wrote a report of the incident and called the police. She notes that she never received the training necessary to subdue or restrain an individual, to use handcuffs, to carry injured persons, or break up dogfights. Therefore, the Court cannot rely on the employer's opinion to determine the essential functions, as these facts are in dispute.

### 3. Amount of Time Spent Performing Functions

16

"An essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential. Rather, an essential function must be a fundamental duty of the job." *Basith v. Cook Cty.*, 241 F.3d 919, 929 (7th Cir. 2001). The District claims that an essential function of VanOoteghem's position is responding to emergencies. Such emergencies would require a CSOPM to run across a park to address an incident, break up a dogfight or a fight between their owners, remove a dog from the park, or perform any necessary first aid.

However, the record is unclear as to how often such emergencies occurred. VanOoteghem claims she never had to break up a fight among dogs or their owners, she was never trained to subdue individuals, and she was never trained to carry injured persons. She further contends that when an emergency occurred she was only required to write a report and call the police. Given these factual disputes and the record's inadequacy as to how often such emergencies were addressed, a reasonable jury could find that responding to an emergency did not require VanOoteghem to act in the manner the District describes.

### 4. Consequences of Nonperformance

VanOoteghem alleges that her successor saw dog aggression at a dog park, did not intervene, and was never disciplined. The District claims that the circumstances required no intervention. The incident in question is described in a summary report given by VanOoteghem's successor, which states:

17

> [O]n 10/11/15 while on patrol at Hammel Don [sic] Park, at 17:30 hrs, [Gutowski] observed overly aggressive behavior by a small Rottweiler, belonging to [redacted] permit [redacted], toward a tan Cocker Spaniel, belonging to [redacted] Permit [redacted] stated that was the second time that the Rottweiler had attacked [redacted] dog that day. Witnesses at the scene also said that the aggressive behavior was not uncommon from the Rottweiler, and on previous occasions they had left the park because of it. [Gutowski] spoke to [redacted] and advised [redacted] of the rules pertaining to control of [redacted] dog. At which time [redacted] leashed [redacted] dog and left the park. Nothing further at this time. S.G. 552

Dkt. # 51-1, Ex. 18. Given that VanOoteghem provides evidence that her successor handled a dogfight without physical intervention, we find a genuine dispute of material fact exists as to whether breaking up dogfights was an essential function of her job.

### 5. Past and Current Experience

VanOoteghem alleges that she never had to perform the tasks the District claims were essential to her job function, and the District has provided no evidence to the contrary.

\* \* \*

As evident from our discussion of the five factors above, the record is rife with material factual disputes that preclude us from determining the essential functions of VanOoteghem's job. Absent such determination, the Court cannot conclude that the undisputed facts show that VanOoteghem could not perform her essential job functions. Accordingly, the Court cannot grant summary judgment on this basis.

### B. Reasonable Accommodation

18

Notwithstanding the parties dispute about the position's essential functions, the District argues that it did not fail to reasonably accommodate VanOoteghem because it provided her with extended leave, temporary light duty assignments, and engaged in the interactive process. But the Court cannot grant summary judgment on this basis without first determining the essential functions of the position, as the two elements are interdependent.

"The ADA requires employers to make reasonable accommodations that will allow a qualified individual with a disability to perform *the essential functions of his or her job*." *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 820 (7th Cir. 2017) (citations omitted)(emphasis added). Under the ADA, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). Given the factual disputes about VanOoteghem's essential job functions, the Court cannot determine the accommodations to which she was entitled, whether she could perform the essential functions with those accommodations, and whether the accommodations that the District provided were reasonable.

Furthermore, if VanOoteghem's restrictions did prevent her from performing the essential functions of her job, the ADA would have required the District to canvass

19

positions and, if a vacant job existed that VanOoteghem was qualified to perform with or without reasonable accommodations, to offer it to her. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694–95 (7th Cir. 1998). While the District claims that Suca met with VanOoteghem to discuss open positions she could be placed in, VanOoteghem denies that she was informed of all open positions for which she qualified. Gerl's testimony shows that he reviewed none of the vacant positions before telling VanOoteghem that she did not qualify for them. Accordingly, whether the District canvassed positions to determine whether a vacant job existed for which VanOoteghem was qualified is also a genuinely disputed material fact.

Since there are genuine issues of material fact present in both elements, the District is not entitled to summary judgment on the failure-to-accommodate claim.

## II.    ADA Discrimination Claim

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to ... the ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Seventh Circuit has concluded that proof of a discharge "on the basis of disability" means disability was the but-for cause. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Thus, to prevail on this claim, VanOoteghem must show: (1) she is disabled; (2) she "was qualified to perform the essential functions with or without a reasonable

accommodation;" and (3) "disability was the but-for cause of [her] discharge." *Scheidler*, 914 F.3d at 541.

The District argues that VanOoteghem's termination was lawful because she could not perform the essential functions of her job.[2]  It is true, as the District notes, that an employer may avoid liability under the ADA if the plaintiff would have been fired because she is incapable of performing the essential functions of her job.  *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 865 (7th Cir. 2005).  But given the parties dispute over the essential functions of VanOoteghem's job, the Court cannot grant summary judgment on this basis.  Accordingly, the District is not entitled to summary judgment on the discrimination claim.

## **CONCLUSION**

For the reasons mentioned above, the Court denies the District's motion for summary judgment.  It is so ordered.

Dated: 7/9/2020

_____
Charles P. Kocoras
United States District Judge

---

[2] The District also argues that its decision to challenge VanOoteghem's ADA unemployment claim was not discriminatory because the activity is not protected by the ADA.  VanOoteghem responds that her discrimination claim is not based on the District's challenge to her unemployment claim, but rather the decision to terminate her employment.  In its reply, the District concedes that VanOoteghem's concession moots this issue.  Accordingly, the Court does not reach this argument.